N. Ray Anderson, James A. Patton, counsel for the appellants Duane E. Anderson and Gene C. Anderson, Brian C. Bramlett, counsel for the Appalachian State of Montana, Montana Department of Natural Resources and Conservation. Okay, I see Mr. Bramlett. Your Honor, this is James Patton. I'm having trouble getting my screen to connect. Here we go. I apologize, getting my video up, Your Honor. You know, don't apologize. We've all had three years of screwing this up, so it's perfectly okay. Are you able to connect? Your Honor, could I run out and get somebody who knows how to do this and not me? It takes just a second. Mr. Bramlett, do you mind waiting a minute? No, Your Honor. Okay. Thank you, Your Honor. You're welcome. We want the folks arguing in all their glory. Video up. What? Video. There you are. Thank you. I apologize to the court and the counsel. Oh, it's clearly worth it. Okay. All right, Mr. Patton, you want to reserve a few minutes? I would, Your Honor. I'd like to reserve three minutes. Okay. You may begin. Thank you. May it please the court. My name is James Patton, and I represent the appellants Dwayne and Jeannie Anderson. This appeal concerns the action of the State of Montana, acting through its Department of Natural Resources and Conservation, the DNRC, in terminating the Andersons' state leases, which resulted in disastrous consequences for both the Andersons and their creditors. The Andersons have advanced five grounds for reversal in their brief, but I want to focus my limited time on the two procedural grounds that have been raised. The first is whether the Andersons adequately pled a claim for breach of duty of good faith and fair dealing in their complaint. The court determined that they did not adequately plead such a claim, and in doing so, the court ignored the liberal Rule 8 rules of pleading. The Andersons' complaint sets out in paragraphs 2 and then 10 through 62 a chain of events and occurrences, which relates to the DNRC cancellation of their state leases. After recitation through paragraph 62, at paragraph 63, the complaint asserts and states that every contract, regardless of type, contains the duty of good faith and fair dealing. And then this allegation is immediately followed by a count for breach of contract. In Montana, a breach of contract. Can I make sure I've got the choreography right? This commences in state court, right? That's correct, Your Honor. Okay, and there's four causes of action or counts in the original state court complaint? One's breach of contract. One is fair dealing and good faith. One is injunctive relief. One is death relief, right? One is breach of contract. One is the tortious, tortious breach of contract. Okay. And the other is… All right, well, if I remember correctly, Montana raises a defense that, well, the second cause of action can't be pursued because you didn't exhaust your remedies or something along those lines, right? No, actually, Your Honor, the second cause of action was withdrawn after the case was removed to bankruptcy court. Well, is it still in the complaint? It is still in the complaint, yes. All right, so it's withdrawn, but kind of sort of not withdrawn, right? But let me go to the heart of my argument here. What is Rule 8 about? Rule 8 is to provide justice, and in this case… And I would suggest it may not be that ambitious. It may be about notice pleading, right? Yes. Okay. The point of notice pleading is to make sure that in a vacuum, there are some default rules for how liberal we are going to be in aid of a plaintiff who might have put it kind of sort of in there someplace and shouldn't be basically 12B6 or defaulted because maybe the dots were not connected exactly the right way. Is that a fair assessment, or do you see it differently? I think that's a fair assessment, Your Honor, and I would certainly… Then how do we play that through this notion that you didn't allege, arguably, good faith and fair dealing on its own in the first instance? You removed that action. You withdrew the thing that kind of looked like good faith and fair dealing. The tortious bit. You never amended, and you've got one paragraph in there that says, every contract has the duty of good faith and fair dealing. I mean, is that the context in which we should be applying Rule 8? Well, I think that in all of the preceding allegations that identify various things that occurred, various steps and occurrences that happened preceding the termination of the lease, that breach that are elements of the breach of the contractual duty of good faith and fair dealing. So keep in mind that there's a tortious breach of good faith and fair dealing. I have it fully in mind. My question is, how does Rule 8 help you here? Given what you did and what you didn't do, how is Rule 8 even relevant here? Well, Rule 8 provides the general rules of pleading, and we contend that the complaint taken as a whole with all of the allegations contained therein identify and set out a claim sufficient to plead a claim for breach of the contractual duty of good faith and fair dealing. All right. Ignoring my question for a minute, what did Judge Hirsch say about that? He said it wasn't adequately pled? That's correct. That was not adequately pled. Why is that a mistake? That's a mistake because he didn't apply the liberality of Rule 8, which, again, it's not an artful pleading. I would concede that. But it identifies various acts and events that occurred. It identifies that there's a contractual duty of good faith and fair dealing, and it identifies immediately after that that there's a breach of contract. All right. Assuming that I agree with you, did Judge Hirsch go on to say, look, even if this weren't a pleading issue, in terms of Rule 8, I'm not seeing how we're in the realm of good faith and fair dealing here. Did he also make that ruling? I don't remember that he made that particular ruling, but that relates to the other procedural error, which is that the Andersons were denied their discovery. And I can, in this case, after removal, the Andersons filed a motion for partial summary judgment on a limited issue of whether the Conservation Reserve Program supplement to their state leases affixed a November 15th date for the payment or, alternatively, a December 31st payment date because the U.S. government was involved, USA was involved through the USDA. Well, fair enough. Those are legal issues, right? Discovery is irrelevant to that, isn't it? Well, that issue is decided, but, I mean, that's part of our appeal. If those are legal issues, Mr. Patton, what good is discovery going to do here? The discovery does us good in terms of the breach of the duty of good faith and fair dealing. The discovery, Your Honor. Okay. That's a fair answer. Okay. But that's different from what I thought you were saying. I got it. Okay. I apologize if I misled the Court. No, no, no. So the discovery goes to two primary events or primary arguments on the breach of the duty of good faith and fair dealing is, one, the state misled and gave the USDA, who has a lien on the state leases, an incorrect date by which the payment had to be made to reinstate the leases. The second issue is that the history of this lease, and certainly the history of the nine or ten years preceding the lease, is that the Department did not strictly enforce the payment dates. It did not strictly enforce other performance dates. And in the spring of 2020, the issue is whether the Andersons could reasonably have expected that the payment would be extended under the fog of the COVID pandemic and the shutdown and stay-at-home orders issued by the State of Montana to virtually everyone in the state. And because of those stay-at-home orders, a couple things happened. One of them is a check that the Andersons paid for the grazing lease was returned with insufficient funds. There is evidence that the bank, although they didn't have a direct loan to pay these funds, the bank would have paid the lease had it known about the stop payment or the bounce check. Also, the USDA attempted to pay the cost of reinstatement. It was given the wrong information as to when that payment date was due. Can I clarify something? Did they inquire about the date, or did they actually send somebody a check? That would be attempting to pay. Did they do that? They did not. They inquired about the payment date. They were given a date of June the 10th, and then after their inquiry, they inquired before June 10th that they wanted to make a payment, and they were informed that the June 10th date was not the incorrect date, that the incorrect date had expired. Okay. But for that incorrect information, the leases would have been paid by the USDA. We don't know that. We flat don't know that. I mean, they said they might have intended to do something. They never sent a check, did they? They did not send a check because they were told not to. But, Your Honor, I think the inferences are to be resolved in favor of the non-movement, which would be the Andersons. So we know that the USDA inquired. We know that the USDA, after the payment date, although that they were not informed correctly of the payment date, they did offer to pay it. And so I think the inference there is that the USDA would have paid it, had they been given the right. This is summary judgment, right? You don't draw inferences either way. It's either a disputed material fact or it isn't. So if that's where you think the judge made a mistake, just say so. Well, I think that is one of the reasons, right? Well, it is an issue of material fact that the USDA inquired within the time that the date set and was given the wrong information. Got it. I'm with you on that. Okay. And that's a breach of the duty of good faith and fair dealing. It's also issue of fact with regards to the previous instances where the state did not enforce the payment deadline. The state did not enforce other performance deadlines under the state leases. And the issue then is whether that led the Andersons to believe that the course of conduct from the past would continue in 2020, particularly under the difficulties of the COVID shutdown and the complications that arose from people not being at work and so forth. Okay. You know, you're right at your three minutes. If you want to reserve now. I would like to reserve now. Okay. Thank you. Thank you. Okay. Mr. Bramlett. Thank you, Your Honor. My name is Brian Bramlett. I'm an attorney with the Department of Natural Resources and Conservation. But in this case, I represent both the department and the state of Montana. And as I speak today, if I reference the department, the court should be aware that I'm referring to both parties. I'm going to focus my time. Can I ask one kind of gating question here? Yes. If I understand correctly, although I know you declared the lease is terminated, for at least some period of time, I don't know that these were re-led or otherwise transferred. Has that happened in the meantime? Yes, that has, Your Honor. After the order on summary judgment, the department moved the bankruptcy court for an order lifting this day, which was not opposed by the plaintiffs here. And we were able to re-let after two years of leaving that land vacant. And you re-let to somebody, not the Anderson's? That's correct. Okay. I'm going to focus my time on explaining the material facts, the applicable law, and if I've got time left, I'll address a few issues raised by the plaintiff's reply. The bankruptcy court got the material facts right here. On January 13th of 2020, the department notified the plaintiffs that their grazing rent was due on or before March 1st. And if they didn't pay it by April 1st, the leases would be automatically canceled. The plaintiffs didn't pay their rent on March 1st by the original deadline. So on March 17th, the department notified the plaintiffs that they had to pay their late grazing rent and a penalty by April 1st, or the former leases would be canceled. The plaintiffs sent in a check on March 30th, but it's undisputed that there weren't sufficient funds in the account to cover that check. So when Rocky Mountain Bank processed the check, they dishonored it, and they returned it to the department unpaid. As a result, it's undisputed that the plaintiffs didn't make a valid rental payment on or before April 1st. None of the plaintiffs' arguments on appeal or in front of the bankruptcy court changes these facts. The bankruptcy court got the law right. The former leases and 776-506-1 provided that their grazing rent was due by March 1st. And if they didn't pay their grazing rent and a late penalty by April 1st, the entire leases would be canceled. The case of Jepson v. State, 205 Mont, 282 at page 286, explains that the former leases were automatically canceled by operation of law when the rent was not paid by the statutory deadline and the department was legally obligated to cancel the lease. The court applied the undisputed facts to the law and correctly concluded that the former leases were automatically canceled for nonpayment. As a result, the plaintiffs can't sustain a breach of contract claim. It's that simple. The plaintiff's speculation about what various entities did or didn't do after the former leases were canceled is legally immaterial. It's well settled that as the initial breaching party, the plaintiffs can't complain about the department's post-cancellation conduct or assert that that was a breach of contract or a breach of the implied covenant. On that note, the implied covenant is entirely dependent on the existence of a valid contract and the terms of that contract. Montana law provides that the implied covenant is only breached when one party uses discretion conferred by the contract to act dishonestly or act outside the accepted commercial practices to provide the other party the benefit of that contract. Mr. Bramlett, let me ask you a question. What is the impact of the department's offering an extension of time basically to reinstate the lease? What is the impact of that on this implied covenant or on the contract? Does it extend contract rights at all? It does not. So the offer for reinstatement is purely a mechanism of statute. One of the sort of limits of the implied covenant is that, one, there has to be an existing enforceable contract in place. So following cancellation of the former leases, there was no existing contract in place. And then, two, the implied covenant has to be based on and tied directly to the express terms of a contract. So the contracts, or the former leases in this case, didn't include the right to reinstatement. And so in order for an implied covenant claim to be sustained, the court would have to insert those terms into the lease agreements, contrary to the limitations of the implied covenant. And that is, you know, primarily I think that regardless of whether the implied Let me ask you a question. Can the implied covenant change the terms of an express covenant? Could you repeat that? You were broken up a little bit.  Can an implied covenant change the terms of an express covenant? Can an implied covenant change the terms of an express covenant? No. So, I mean, that's set forth in a number of Montana cases, including House v. U.S. Bank, that v. Farmers Insurance. And what the court says there is essentially the implied covenant cannot amend or alter the terms of the express terms of a contract. And it does not apply where the express terms govern. I'm sorry. I think Mr. Patton is arguing something like a course of performance, that over the many years before this, I mean, I don't know exactly what the instances were, but the allegation seems to be that, look, he didn't always do things on time and it always kind of worked out. So, I mean, I'm not trying to suggest I can say it any more articulately than that, but just generally, in your view, where would a course of performance argument fit in this scenario? I don't believe it does. So, I mean, the express terms of the contract, paragraph one of each of these former leases, expressly provides that if the rent is not paid, the leases are automatically canceled. It confers no discretion onto the department to do anything otherwise. And so the implied covenant can't be applied because, one, there's no discretion, and two, these express terms govern the relationship. If just hypothetically in the past, notwithstanding that, the lease hadn't been terminated and things had sort of been worked out, is that irrelevant to this question? I don't know whether it's relevant, but those aren't the facts. And, you know, if the court has concerns about that, I think you can look at page 17 through 19 of the plaintiff's reply brief and what they argue there, and they state that the department breached the implied covenant when it refused to accept the offers from Rocky Mountain Bank and USDA to pay for reinstatement of the former leases. And so as far as I can tell from their arguments, granted this was never pled, their breach of the covenant claim is based on conduct that occurred after the leases were already canceled. Yeah, I mean, I thought I was hearing, of course, the performance argument, which would be a little bit different, but thank you for answering my question. Yeah, I would like to address some of the factual arguments that they make about the covenant. So the court closely evaluated the plaintiff's complaint and their discovery responses to determine whether or not it had been pled. And I think, you know, the court has already pointed out here that notice pleading is liberal, but it's not that the plaintiff has pleaded. And because notice pleading is liberal, the department submitted contention interrogatories to the plaintiffs in which they asked them to explain what their complaint meant. And they did not identify in any of their responses a basis that could sustain an implied covenant claim. In fact, after they dismissed their tortious implied claim, they expressly told us that we were not entitled to discovery as those allegations because it wasn't likely to lead to the discovery of relevant information. The court didn't simply say that they hadn't pled it, but it went further and evaluated the evidence they submitted to see whether or not it could sustain such a claim. On this, I'd like to address the plaintiff's contention that the court disregarded evidence that Mr. Anderson notified the USDA of the payment problem and then that the USDA offered to pay for reinstating the leases on May 7th of 2020. The record confirms that this argument wasn't made below. The plaintiff's summary judgment response argued that Mr. Anderson didn't learn about the payment problem until June 4th, at which time he reached out to Rocky Mountain Bank for help getting his leases reinstated. Those arguments are found at ER 763, 777, and 788. At ER 996 includes the transcript of the summary judgment hearing and it includes the following explanation from the plaintiff's counsel during that hearing. Quote, Mr. Gannett, the USDA offered to pay on May 28th. Rocky Mountain Bank offered to pay on June 2nd and again on June 5th. This is all before June 10th deadline when the Andersons would be able to make that payment and with a cabin lease they did. The court, just remind me, remind me of those dates again before June 10th. Say those again, Mr. Gannett. Yeah, the USDA offered to pay on May 28th. Rocky Mountain Bank offered to pay on June 2nd and June 5th. The court didn't ignore these arguments. The plaintiff's never made them and they're not properly before this court on appeal. The arguments that the department accepted plaintiff's payments in the past past the deadline is not supported by any evidence. As explained in our response brief, the 2016 bank records weren't identified in response to the department's motion for summary judgment. They haven't been authenticated by the bank and they constitute hearsay. Ironically, in the plaintiff's reply, they maintain that the department's explanation should be disregarded because it's based on hearsay. And this confirms our point. Absent proper foundation from a sworn declaration of the bank, the bank records aren't evidence of anything. Regardless, they can't reasonably be construed as evidence that the department accepted late rental payments on January 8th of 2016 for the reasons explained in our brief. I'd like to briefly address the plaintiff's impossibility argument. So in our brief, we argue that impossibility has to be raised as an affirmative defense. And I don't think this court has to decide that as a matter of law. The point is that the doctrine shields a non-performing party from damages by voiding the contract where the object of the contract is made impossible by intervening events. It can't be used as a sword by a non-performing party to claim damages. Moreover, impossibility requires proof that no party could perform under the changing conditions. It's undisputed in this case that 4,300 lessees paid their grazing rent on time in 2020 despite the fact that COVID-19. The reality is that COVID had nothing to do with the plaintiff's failure to pay their rent, and the court found the only reason that they failed to pay their rent is they lacked sufficient funds. And then I'd like to discuss the court's order staying discovery briefly. I think our brief and the order stay speak for themselves, but there's some arguments contained in the plaintiff's reply brief that need to be addressed. First, the plaintiff asserts that the department was sanctioned for discovery abuse. This is patently false. Although the department was ordered to produce what amounted to a handful of internal emails, a briefing paper, and a timeline, the court explained in open court and in its June 7, 2021 order that it was not imposing sanctions. The plaintiffs didn't include this order as part of their supplemental record, but it can be found at ECF 118, page 2, footnote 2. The records were produced three months before the plaintiff's summary judgment response was filed, and none of those records were cited in either party's summary judgment briefing. If the plaintiffs needed additional discovery to resist summary judgment, they're required to file the pursuant to 56B prior to filing their response. They didn't. The summary judgment hearing wasn't an opportunity for the plaintiffs to reinvent their case. It was to address the court's concern that the plaintiff's response brief was inconsistent with the record or attempting to mislead the court. The reality is that no amount of discovery would produce evidence sufficient to resist summary judgment in this case. It was well within the court's discretion to stay discovery to avoid the continued burden of discovery and expenses on the department. Summary judgment isn't a test drive. The undisputed evidence set forth in the department's motion established that the plaintiffs failed to pay their grazing rent before the April 1, 2020 deadline, and as a result, the former leases were automatically canceled. The plaintiffs were required to present specific evidence material to the outcome of the case upon which a reasonable fact finder could resolve in speeding their favor. The plaintiffs failed to do so because no such evidence exists. It's not even close. The USDA wasn't the lessee. Rocky Mountain Bank didn't make a mistake. COVID didn't cause their default. The department didn't act dishonestly or unfairly, and the bankruptcy didn't air when it concluded the department didn't breach the former leases as a matter of law and entered summary judgment. The simple truth is that the plaintiffs failed to pay their grazing leases by the April 1 deadline, and that had consequences under the terms of the lease and the Montana Code. Accordingly, we respectfully request that the court affirm the bankruptcy court's order and deny the appeal. Any questions? No. Okay. Thank you very much. Okay. Mr. Patton, you've got just about three minutes. Thank you. I want to make two points about the past conduct of the department with respect to late payments. There was a late payment made in June of 2011, well past the April deadline. The department accepted that. They exercised some kind of discretion to allow a late payment then. They did the same in 2016 when there was a late payment. Can I ask, where are we going to find that in the record? Where was that admitted as evidence? Off the top of my head, I can't tell you. Okay. I got it. Thank you. With respect to staying to discovery, after the department filed its motion for summary judgment, it continued discovery. The Anderson sought to take depositions of 30B6, depositions of department employees in August of 2022, and only continued those depositions and reset them for September at the department's request. So while the summary judgment motion was pending, the Andersons requested to take depositions in August. The DNRC said, oh, we're too busy in August. Let's do it in September. The Andersons said, okay, we agree. We'll do that. They noticed up the depositions in the middle of August to set them in that September deadline, time period. And it was well within the discovery period that had previously been ordered by the bankruptcy court. The DNRC, after the submission of the summary judgment, after it was fully briefed, served discovery on the Andersons. The Andersons answered that discovery on August the 31st at 420 in the afternoon. And 55 minutes after they submitted that discovery to the discovery response to the DNRC, the DNRC filed a motion for stay of discovery. So the DNRC got the discovery that it wanted. It got an extension of the deposition time period to accommodate its schedule. And then at the end of August, it wants a stay of discovery before the Andersons get to do their depositions. They should have been allowed to do their depositions and depose the DNRC witnesses about the very things that the state is saying are non-controverted, the late payments before, the past conduct in administering these leases, and they were denied that opportunity by reason of the stay. And that I would submit as a breach of the abuse of discretion by the bankruptcy courts to have stayed the discovery. Okay, thank you. Any questions? Okay. Thank you both very much. Very interesting case. Okay. And that matter is submitted and we'll be getting a written disposition promptly.
judges: Lafferty, Brand, and Corbit